## GRIFFITHS vs. KELLOGG.

PROMISSORY NOTE. *(1) When maker, whose signature is obtained by fraud, not liable, even to innocent holder. (2) Query, whether purchase at discount, without indorsement or inquiry, is* bona fide. *(3) Finding of jury as to maker's negligence in signing, final.*

1. Where an instrument in the form of a negotiable promissory note of the defendant was not voluntarily made by her, but her signature was procured by a fraud practiced upon her, under pretense of getting her to sign a different note for a less sum, it was *not her note,* and she is not liable upon it, even to an innocent holder.

2. Whether one who purchases commercial paper at a great discount, from a stranger, without indorsement and without making inquiry within his power, can always be held to be a *bona fide* purchaser, *quære.*

3. The question whether defendant, who was unable to read the paper signed by her, was guilty of negligence to estop her from denying, as against a *bona fide* purchaser, that she made the note, having been fairly submitted to the jury, and the court below having refused a new trial after a verdict in her favor, this court would not reverse the judgment on the ground that she was guilty of such negligence, even if disposed to think differently from the jury.

APPEAL from the Circuit Court for *Rock* County.

*Griffiths* brought his action in justice's court upon a promissory note for the sum of $76.25, alleged to have been made by the defendant *Pluma Kellogg* to the order of Gillespie Bros., and by them sold and assigned to plaintiff before maturity. The answer admitted the making of a note for $47.50, but denied having executed any note for $76.25. Defendant had judgment, from which plaintiff appealed to the circuit court. Upon the trial there, plaintiff offered in evidence the following note:

"$76.25.                                     May 6, 1874.

"Six months after date I promise to pay to the order of Gillespie Bros., or bearer, seventy-six 25-100 dollars, at the First National Bank of Janesville, value received, with use at ten per cent.                                     Pluma Kellogg."

Defendant testified that the note was given for a lightning rod; that she agreed with Johnson, the agent, sometime in May, to give him a note for $47.50, the price of the rod, payable in six months or one year from the following fall. He drew up a note for $47.50, payable in six months, which she refused to sign. He then drew another note, and read it as for the same amount, payable six months or a year from the following fall. Witness signed this note, but did not read it, being unable to read it without her glasses, which were at the house of a neighbor. Johnson then gave witness the following obligation:

"$47.50.                                                     May 6, 1874.

"I hereby agree to extend the obligation of Mrs. P. Kellogg at the expiration of six months until the following fall one year.                                    JOHNSON & CLARK."

Witness further testified: "After he had finished, he read the obligation and I saw he hadn't put down the amount, and I asked him if he would not please put down the amount of $47.50 on that obligation, the amount in the note as he read it. He read the last note payable in six months or a year from the following fall and for $47.50; and that is what I supposed it was when I signed. I refused to sign a note payable absolutely in six months. I never intended to sign a note of $76.25. I never heard of that amount. There was no such agreement ever made between us." Defendant further testified that two of her children were present at the time, who could read writing, but she did not ask them to read the note before signing; that the note read was payable to Gillespie Bros., without any "bearer" to it; that "he was not to sell the note; they said they would not sell it, and that they always held them."

The two children of defendant were sworn, and their testimony corroborated hers.

Plaintiff, in rebuttal, testified that he knew nothing of the circumstances under which the note was given; that he bought it before maturity, and paid $65 for it and another note of $10 ; and that he did not know what Johnson's business was when he purchased the notes of him, but learned afterwards.

Verdict for defendant; and, a new trial being denied, plaintiff appealed from a judgment on the verdict.

*E. F. Carpenter*, for appellant, argued that, since defendant had failed in any way to connect plaintiff with the alleged transaction with Johnson, she could not avail herself of anything in that transaction as a defense, especially as it was proven affirmatively that plaintiff bought the note for value

before maturity, and without notice of any equities existing between the original parties. It is assumed by the defense that this court has established a new rule in regard to commercial paper in the hands of a *bona fide* purchaser for value, before maturity, and without notice; but the cases relied upon are clearly distinguishable from this. See *Walker v. Ebert*, 29 Wis., 194; *Kellogg v. Steiner*, id., 626. The evidence shows clearly that defendant was guilty of negligence by which she is estopped, as against an innocent purchaser for value, from asserting that she intended to sign a different obligation, or that any statements made to her were false. *Chapman v. Rose*, 56 N. Y., 137; *Putnam v. Sullivan*, 4 Mass., 53; *Douglas v. Matting*, 29 Iowa, 498. Where the maker or indorser of a note, or the drawer or indorser of a bill, negotiable by the law merchant, executes the same in such form or under such circumstances as to allow himself to be defrauded and deceived as to the amount, he will be conclusively estopped by his own negligence from setting up such fraud or deception as a defense in a suit by a *bona fide* holder for value, who purchased before maturity and without notice. *Garrard v. Hadden*, 67 Pa. St., 82; *Redlich v. Doll*, 54 N. Y., 234; *Michigan Bank v. Eldred*, 9 Wall., 550; *Rainbolt v. Eddy*, 34 Iowa, 440.

The cause was submitted for the respondent on the brief of *Bennett & Sale*, who contended that the defense went back of all questions of negotiability, or of *bona fide* holders, to the validity of the instrument itself. It is idle to talk about the enforcement of a note which never had any legal existence. Yet, should the doctrine contended for by the plaintiff prevail, it could not be applied to nonnegotiable paper, such as this would have been· had it been drawn in accordance with defendant's agreement, embodied in the contract assented to by her. *Taylor v. Atchison*, 54 Ill., 196; *Wait v. Pomeroy*, 20 Mich., 425; *Loomis v. Ruck*, 56 N. Y., 462. To the point that the testimony as to what occurred between the original

parties was admissible, see *Walker v. Ebert*, 29 Wis., 194; *Kellogg v. Steiner*, id., 626; *Butler v. Carns*, 37 Wis., 61. 2. The question whether the defendant was guilty of such negligence, in putting her signature to the note, as would deprive her of the defense set up, was one for the jury, and was fully and fairly submitted to them, and was finally disposed of by their verdict.

RYAN, C. J. We shall not attempt to examine the very many exceptions in this case, but will content ourselves with passing upon the questions arising on the record.

The question was very fully and fairly submitted to the jury, whether the respondent voluntarily made the note in suit, or whether her signature was procured to it by a fraud practiced upon her under pretense of getting her to sign a different note for a less sum which she really owed to the lightning-rod man. The jury found that the fraud was practiced upon her, and that she did not voluntarily make the note in suit. We entirely concur in the verdict. It is impossible to read the evidence without coming to regard the transaction as a fraudulent imposition upon the respondent. The note in suit was as little hers as if the transaction between her and the lightning-rod man had not taken place, and he had forged the note. If not forgery, it was akin to forgery. And the note so obtained is not the contract of the respondent. This is not an open question in this court. *Walker v. Ebert*, 29 Wis., 194; *Kellogg v. Steiner*, id., 626; *Butler v. Carns*, 37 id., 61; *Chipman v. Tucker*, 38 id., 43; *Roberts v. McGrath*, id., 52; *Roberts v. Wood*, id., 60.

It was, indeed, contended that this doctrine is not applicable to negotiable paper, when the maker is not deceived as to the nature of the paper, but only as to the amount or other details of it. But it has been frequently applied to negotiable paper in this court. See the cases cited *supra*. The language of DIXON, C. J., in *Walker v. Ebert*, approved in *Chipman v.*

*Tucker*, explains the rule and the reason of the rule, and is conclusive of its application. "The inquiry in such cases goes back of all questions of negotiability or of the transfer of the supposed paper to a purchaser for value, before maturity and without notice. It challenges the origin or existence of the paper itself; and the proposition is to show that it is not in law or in fact what it purports to be, namely, the promissory note of the supposed maker. For the purpose of setting on foot or pursuing this inquiry, it is immaterial that the supposed instrument is negotiable in form, or that it may have passed to the hands of a *bona fide* purchaser for value. Negotiability in such cases presupposes the existence of the instrument as having been made by the party whose name is subscribed; for, until it has been so made and has such actual legal existence, it is absurd to talk about a negotiation, or transfer, or *bona fide* holder of it, within the meaning of the law merchant."

The protection of the law merchant to a *bona fide* holder of negotiable paper is not absolute. He runs the risk of the validity of the paper which he purchases, for which he relies not on the maker, but on his immediate indorser. And question might be made whether one who purchases commercial paper, at a great discount, from a stranger, whose name he does not well know, without indorsement, without inquiry within his power, as the appellant did, can always be held to be a *bona fide* purchaser.

Whether the respondent, being unable to read the paper which she signed, was guilty of negligence to estop her from setting up this defense against a *bona fide* purchaser, was fairly submitted to the jury, and answered by their verdict for her. The jury who gave the verdict, and the learned judge of the court below who refused a new trial, saw and heard the respondent and her children testify, and were better able to judge than we are whether her not appealing to her children for assistance was negligence under the circumstances.

And even if we were disposed to think differently, we should not feel at liberty to disturb the verdict or the order denying a new trial, on that ground.

*By the Court.* — The judgment of the court below is affirmed.